## ALAMO CAS. CO. v. SMITH.

### No. 4942.

Court of Civil Appeals of Texas.

Beaumont.

Dec. 17, 1953.

Rehearing Denied Feb. 17, 1954.

Collins, Garrison, Renfrow & Zeleskey, Lufkin, for appellant.

Faver & Barnes, Jasper, for appellee.

WALKER, Justice.

Appellee Smith is the plaintiff and the appellants Alamo Casualty Company and General American Casualty Company are the defendants.

The suit is on a policy of insurance issued to plaintiff by defendant Alamo which defendant General became obligated to pay. In a stipulation this is referred to as a "standard automobile policy," and the plaintiff's claim is based on the following provisions of the policy, which we take from the same stipulation: "It is further stipulated that the aforesaid policy of insurance provides coverage for the plaintiff—not to exceed $2,000 to each person, with the insurance clause—providing: *'To pay all reasonable expenses* incurred in one year from the date of the accident *for necessary* medical, surgical, ambulance, hospital, professional nursing, and *funeral services to or for each person who sustains bodily injury,* sickness or disease *caused by accident, while in* or upon, entering or alighting from *the automobile,* if the automobile used by the named insured or with his permission.'" The words italicized are those on which the trial court's judgment depends.

The plaintiff's wife died as a result of injuries accidentally sustained in a colli-

sion between the automobile in which she and the plaintiff were riding and another object, and the defendants, acting under the provisions of the policy which has been quoted, paid $979.66 of the expenses which were incidental to Mrs. Smith's funeral. The total amount of these expenses was $1,212.60. The undertaker's statement itemizing these expenses indicates that the $979.66 was paid to him. The parties' stipulation shows that the $979.66 paid for the following items: "(1) casket, service and trip to Livingston, Texas, $850.00; (2) State tax, $10.75; (3) paid to the Pace Funeral Home (this concern did not conduct the funeral) $116.35; (4) telephone calls concerning funeral $2.56."

The defendants refused to pay for the rest of the expenses which were incidental to Mrs. Smith's funeral. The expenses which defendants refused to pay were the cost of a vault, which was $225, and the following, which we take from Finding 10 of the trial court's Findings of Fact: "Telephone calls concerning payment of account and protested check and two calls to Beaumont—$2.26; two calls to Jasper—$1.76; one call to Texarkana—94 cents; collect telegram to bank concerning protest of check—58 cents; charge for protest of check—$2.40." We infer from questions asked witnesses that the vault was a steel box in which the casket was enclosed. The only evidence about the other expenses which defendants refused to pay is the itemized statement given plaintiff by the undertaker, and the part of Finding 10 just quoted is a substantial copy of the part of this statement which refers to these expenses. However, the trial court found in paragraph III of the Amended Findings that these expenses "were all expenses brought about by the failure of defendants to pay the account owned by them;" and the parties have not questioned this finding.

Plaintiff sued for the cost of the vault and for the other expenses which the defendants refused to pay, and after a trial to the court without a jury, the trial court rendered judgment in plaintiff's behalf against defendants for the total amount of these items. From this judgment the defendants have appealed.

## Opinion

■ (1) The promise of the defendants on which the plaintiff's right to recover depends may be stated as follows: "to pay all reasonable expenses * * * for necessary * * * funeral services." In the provision quoted from the policy "necessary" qualifies "funeral" just as it qualifies the word "medical" immediately following it. The question then is, not whether the vault and the other items sued for by plaintiff were "reasonable expenses * * * for * * * funeral services" but whether they were "necessary * * * funeral services." The reasonableness of the charges made for the items in suit (to which "reasonable expenses" seems to refer) is not in issue; it is liability for these services which the defendants deny.

(2) The parts of the policy proved contain no definitions and the parties relied on evidence of extrinsic matters to show what the terms of the defendants' promise mean.

The defendants adduced testimony from two professional morticians about the custom of their profession respecting the use of vaults in burials. One, Mr. Fore, resided in Nacogdoches; he said that the average expense for a funeral conducted by his concern was from $350 to $500. The other, Mr. Dailey, resided in Beaumont; he said that "the average funeral would run around, say seven or eight hundred dollars. It often runs higher." He also said that the average cost of a funeral in a small town was substantially less than in a city like Beaumont "because the overhead is cheaper."

Both of these witnesses testified that a vault was not a part of what they regarded as a funeral service. On the other hand, their testimony shows that clothing for the dead person and the opening of the grave were also not included in a funeral service but were considered extra

items for which separate charges were made, as were made for vaults. A more significant part of their testimony is, however, that concerning the use of vaults and the kinds and cost of vaults. The substance of the testimony of these witnesses is that the public sometimes uses a vault but not so frequently as to establish a custom. Mr. Fore said that vaults were not often used, and the sense of Mr. Dailey's testimony is that the use of vaults was at least not usual. It is also apparent from the testimony of these witnesses that the use of a vault was a matter of individual choice which had no necessary connection with the station in life or the size of the estate of the dead person. Various reasons why vaults are not customarily used are suggested by the testimony of these witnesses. One is the existence of a religious belief that the human body should not be prevented from becoming a part of the earth. Another is evidently the cost of a vault. It appears that vaults are of different kinds; they may be of steel or other metal, or of wood, or may be made of brick or concrete; and the price charged for a vault varies from a comparative small sum to thousands of dollars. According to Mr. Fore, this variety in kind and in expense was a reason why his profession considered the vault an extra item. He said: "I will say I don't know of any funeral home that prices the vault as a complete service. It is an extra item due to the fact there is so many different kinds of vaults. You wouldn't know whether it was a $150 one or a $5,000 one. It could run more than the casket would." Mr. Dailey said that use of a vault might be reasonable in a particular case, but this testimony had a qualification. He said: "If they wanted to buy it I wouldn't say it would unreasonable. I would put it in this respect. It would be kinda like a man * * * if you can afford a Cadillac, if you wanted to buy it, that is not unreasonable as long as you can afford it."

In no sense was a vault necessary to a burial. It appears to be only a container in which the casket is put, and its purpose, we infer, is to preserve the contents of the casket. However, the testimony of Mr. Fore and Mr. Dailey shows that the typical funeral service provided not only a casket but also a container for the casket. Mr. Fore said: "Q. Now, if someone came into your establishment and said they wanted a $150 funeral, you would give them the funeral commensurate with that price? A. That is right. That would include the casket, the outside box and et cetera.— Services that go with it; funeral car and flower car." Mr. Dailey said: "That covers the casket, embalming and professional services, such as securing permits and all that, and includes the outside box which is a wooden burial case, which is actually a receptacle for the casket, and then the use of the funeral parlor is included in that." And he said further: "Q. When you consult these people concerning the arrangements for a funeral, do you call their attention to the fact that you provide vaults if they want them? A. Well, after you get through * * * after they select the casket, the vaults are in the showroom, and you always bring it to their attention that you have them, they are available, and if they would like to have one you can sell them one; or else explain to them they can use the regular box the casket comes in."

The plaintiff was the only witness who testified in his behalf. He was not a mortician and had not engaged in that profession, and he accordingly knew nothing about the matters concerning which Mr. Fore and Mr. Dailey gave the testimony just summarized. The plaintiff did testify to the following matters which, he argues, were pertinent to the issue of liability. Plaintiff's wife was 27 years old and he was 35 years old, and they had been married 5 years when the collision occurred. Mrs. Smith was a graduate of Louisiana Polytechnic College and had taught "in the children's department in Shreveport" prior to their marriage. Plaintiff's home is Magnolia Springs in Jasper County; he owns his home and it is fully paid for; he is a wholesale dairyman by occupation; he owns or operates a dairy farm of 125 acres; this farm is utilized in growing

dairy cattle and in producing milk and milk products. Plaintiff is a native of Jasper County and has resided in that county practically all of his life; he is not seriously indebted; he pays his bills as he goes; he has no difficulty with credit relations around about Jasper. Plaintiff says that these circumstances indicate his station in life and have some bearing on whether his use of a vault was reasonable, but there is no evidence concerning the value of his estate or the amount of his income.

(3) We hold that under the facts proved (and our judgment is limited to those facts) the vault was not a "necessary * * * funeral service" within the terms of defendants' promise to pay. Not only was it unnecessary in a literal sense; its use was not customary but was, instead, a matter of individual choice which an insurer would have much difficulty in predicting. By the terms "necessary * * * funeral service" the defendants meant something less than that which was merely appropriate to and proper to be used in a funeral.

(4) We infer that the other expenses, totaling $7.94, which the defendants refused to pay were incidental to the defendants' refusal to pay for the vault; and since the defendants were not obligated to pay for the vault they are not obligated to pay these expenses.

The judgment of the trial court is accordingly reversed and judgment is here rendered in behalf of the defendants, that plaintiff take nothing.

### On Motion for Rehearing

(1) To repeat, the defendant's promise is: "to pay all reasonable expenses * * * for necessary * * * funeral services."

■ (2) We agree with the plaintiff that "necessary" does not mean "indispensable"; but we did not hold that it meant this and we did not, in fact, define "necessary". However, we think that defendant put "necessary" into its promise, to limit its liability within the $2,000 which was its maximum liability under this promise, and that in using "necessary" defendant intended to exclude an item which might be appropriate to a funeral and within the capacity of the insured to pay, but which was only of a matter of personal choice by the insured and was not generally and by common usage done or furnished or provided as a part of a funeral. It may be that common usage sometimes is affected by the station in life of the insured; but the evidence before us simply shows that the use of a vault was a matter of personal choice regardless of station in life.

■ (3) The word "reasonable" in the defendant's promise refers only to the amount of the charge made for an item, that is, the sum of money to be paid for an item which is "necessary". The fact that the insured may be financially able to pay for a vault in addition to the rest of a funeral does not show that a vault was "necessary"; and the trial court's finding that the items in suit were reasonable expenses are, under our construction of the contract either immaterial or, if intended to cover the subject matter of "necessary" without support in the evidence.

■ (4) We do not find that defendant's counsel stipulated the issues to be determined or that they did anything in the trial court which controls our right to give the defendant's promise the interpretation we think it should have. Plaintiff's claim and defendant's defense were bottomed upon the same provision of the contract. It was defendant's theory that this provision made the defendant not liable for the items in suit, and defendant contested liability upon the evidence of custom and other matters which are summarized in our opinion. The construction to be given the promise of the defendant was a question of law, and the basic contention of the defendant and the proof made by the defendant raised this question for our decision. The plaintiff makes no criticism of the evidence upon which we have acted nor any criticism of

our conclusion to render judgment—if he be not entitled to recover upon his own interpretation of the contract and the evidence which he adduced.

The motion for rehearing is overruled.